# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| **GENERAL ELECTRIC CAPITAL CORPORATION,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. CV 08-B-0171-J** |
| | } | |
| **EMERGYSTAT, INC.;** | } | |
| **EXTENDED EMERGENCY** | } | |
| **MEDICAL SERVICES, INC.;** | } | |
| **MED EXPRESS OF MISSISSIPPI,** | } | |
| **LLC,** | } | |
| | } | |
| **Defendants,** | } | |
| | } | |
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **Intervenor.** | } | |
| _____ | } | |
| | } | |
| **GENERAL ELECTRIC CAPITAL** | } | |
| **CORPORATION,** | } | |
| | } | |
| **Cross-Claimant,** | } | |
| | } | |
| **v.** | } | |
| | } | |
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **Cross-Defendant.** | } | |
| _____ | } | |
| | } | |
| **SOUTHLAND HEALTH** | } | |
| **SERVICES, INC., d/b/a** | } | |
| **EMERGYSTAT; EMERGYSTAT** | } | |
| **OF SULLIGENT, INC., d/b/a** | } | |
| **EMERGYSTAT,** | } | |
| | } | |

|                             |     |                        |
|-----------------------------|-----|------------------------|
| **Plaintiffs,**             | }   |                        |
|                             | }   |                        |
| **v.**                      | }   | **CASE NO. CV 08-B-0699-J** |
|                             | }   |                        |
| **DRAYTON NABERS, Court**   | }   |                        |
| **Appointed Receiver,**     | }   |                        |
|                             | }   |                        |
| **Defendant,**              | }   |                        |
|                             | }   |                        |
| **UNITED STATES OF AMERICA,** | } |                        |
|                             | }   |                        |
| **Intervenor.**             |     |                        |

## <u>MEMORANDUM OPINION</u>

This case is before the court on plaintiff's Motion for Summary Judgment, (doc. 63),[1] and plaintiff's Motion for Entry of Judgment on Priority, (doc. 112.)  Upon review of the submissions of the parties, the arguments of counsel, and for the reasons stated below, the court finds that the plaintiff's Motion for Summary Judgment is due to be granted.  The court further concludes that the issue of priority, between respective secured claims and federal tax lien claims asserted by plaintiffs and the IRS, is ripe for ruling; therefore, plaintiff's Motion Entry of Judgment on Priority is due to be granted.

## I.    Overview

This is an action for judgment on a contract.  (Doc. 1.)  Plaintiff General Electric Capital Corporation ("plaintiff") seeks repayment of a loan and foreclosure of its liens and security interests securing that obligation.  (Doc. 1.)  Plaintiff has moved for summary judgment.  (Doc. 63.)  Although defendants have provided no opposition to the

---

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

motion,[2] the United States of America (the "United States" or the "government") has

intervened to assert the priority of a federal tax lien over plaintiff's security interest in

collateral securing repayment.  (Docs. 70 & 72.)

## II.    Legal Standard

Summary judgment is appropriate when the record shows "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no

genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See*

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970).  In this case, plaintiff, the moving party, has the

burden of proof at trial.  The Eleventh Circuit has stated:

> When the *moving* party has the burden of proof at trial, that party must
> show *affirmatively* the absence of a genuine issue of material fact:  it "must
> support its motion with credible evidence . . . that would entitle it to a directed
> verdict if not controverted at trial."  In other words, the moving party must
> show that, on all the essential elements of its case on which it bears the burden
> of proof at trial, no reasonable jury could find for the nonmoving party.

*United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (*en*

*banc*) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J.,

dissenting)).  Once the moving party has met its burden, Rule 56(e) requires the non-

moving party to go beyond the pleadings and show that there is a genuine issue for trial.

---

[2]  The court originally scheduled a hearing on plaintiff's Motion for Summary Judgment
on December 4, 2008.  (Doc. 66.)  Due to the substitution of defense counsel, (doc. 67, 71, &
74), the court postponed the hearing until February 11, 2009, and gave defendants' new counsel
until January 20, 2009, to respond to plaintiff's Motion.  No response was received.

Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Evans v. Stephens*, 407 F.3d 1272, 1284 (11th Cir. 2005) (Carnes, J., concurring specially) (quoting *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)).

In the event no opposition is raised against a motion for summary judgment, a district court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *United States v. One Piece of Real Property*, 363 F.3d 1099, 1101 (11th Cir. 2004) (citing *Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir. 1988)). The court is not required to review all evidence on file at the time the motion for summary judgment is granted, but it must guarantee that the motion has evidentiary support. *Id.* At the very least, the court must consider the evidence submitted with the motion itself. *Id.* at 1101-1102 (citing *Jaroma v. Massey*, 873 F.2d 17, 20 (1st Cir.

1989)).  Finally, the district court's order granting summary judgment must address the merits of the motion such that effective appellate review is possible.  *Id*. at 1102.


III.   **Case Summary**[3]

On January 29, 2008, plaintiff filed this breach of contract action against Emergystat, Inc; Extended Emergency Medical Services, Inc.; and Med Express of Mississippi, LLC (collectively, "defendants").  (Doc. 1.)  These entities—which offer ambulance services—comprise three of five wholly-owned subsidiaries of Southland Health Services, Inc. ("Southland").  (Doc. 21, Ex. 1, Form 10K at p. 1.)  All three named defendants have their operational headquarters in Vernon, Alabama.  (Doc. 21, Ex. 1, Form 10K at p. 1.)  The ultimate parent company of both Southland and defendants is Paladin Holdings, Inc., formerly known as Bad Toys Holdings, Inc. ("Paladin").  (Doc. 21, Ex. 1, Form 10K at p. 1; Doc. 64, p. 19-20.)  Larry N. Lunan ("Lunan") controls Paladin and its subsidiaries.  (Doc. 64, p. 23 & 40.)

Defendants, along with another Southland subsidiary—Emergystat of Sulligent, Inc. ("Emergystat of Sulligent" or "Sulligent")—entered into a Loan and Security Agreement with plaintiff on April 30, 2003.  (Doc. 64, Ex. 2; Doc. 90, Ex. D.)  Plaintiff

---

[3]  As required when determining a motion for summary judgment, the court has construed the facts in the light most favorable to defendants and the United States, as non-moving parties. All disputed facts are resolved in their favor, and all reasonable inferences arising from those facts are drawn in their favor.  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 3188-89, 111 L. Ed. 2d 695 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

provided the four subsidiaries with a $5 million revolving line of credit secured by, among other things, the subsidiaries' ambulances and accounts receivable. (Doc. 64, Ex. 2 - 8, 10; Doc. 90, Ex. A- D.) Paladin guaranteed the debt. (Doc. 64, Ex. 4.) Although the original loan agreement has been extended and modified over the years, (doc. 64, Ex. 3, 5 - 7), plaintiff continues to own and hold all obligations under the loan, and all of defendants' obligations thereunder are owed to plaintiff. (Doc. 65, ¶¶ 11 - 12.)

On January 23, 2008, the operations of Southland and its subsidiaries ceased due to the loss of professional liability insurance. (Doc. 64, Ex. 1, p. 54-55.) At a February 11, 2008, hearing held in this case, Lunan testified that Southland went from operating approximately 83 ambulances to zero after the shutdown, and, as of February 11, back to operating five ambulances. (Doc. 64, Ex. 1, p. 58.) The resumed operations were apparently short-lived, (doc. 87, p. 8-9), and all of defendants' operations have ceased. When the Southland entities are not operating ambulances, they do not generate new accounts receivable. (Doc. 64, Ex. 1, p. 58.)

### A.    Prior Litigation

#### (i)    Bankruptcy Case

At the time this case was filed, Emergystat of Sulligent was the debtor in a Chapter 11 proceeding in the United States Bankruptcy Court for the Eastern District of Tennessee. *In re Emergystat of Sulligent, Inc.*, No. 07-51394, 2008 WL 597613 (Bankr. E.D. Tenn. Feb. 29, 2008). (Doc. 70, Ex. 2.) The bankruptcy court dismissed the case on February 29, 2008, with the support of GECC and the Internal Revenue Service and over

6

the objections of both Emergystat of Sulligent and Southland.  *See id*. at \*3 & \*8-9.

(Doc. 70, Ex. 2.)  Emergystat of Sulligent's debts at the time were substantial.  *Id*. at \*1.

The Internal Revenue Service filed proof of a claim in excess of $17.3 million, and

GECC claimed debts in excess of $2.3 million.  *Id*.  Emergystat of Sulligent's assets were

significantly less than its outstanding obligations.  *Id*.

Both Lunan and Dudley Bell, the controller for Southland, testified at a December

17, 2007, hearing in the bankruptcy case.  *Id*. at \*3.  The evidence presented at the

hearing established that, prior to the filing of bankruptcy, "all of Southland's employees,

along with all of the employees of the other Southland entities, were considered

employees of [Emergystat of Sulligent] that were then 'leased' to Southland and the

Southland entities."  *Id*.  Emergystat of Sulligent paid all of the employees of Southland

and its entities, and it was responsible for paying all of their payroll taxes.  *Id*.  In reality,

Southland was supposed to pass funds from the entity that leased the employees to

Emergystat of Sulligent so that it could make payroll and pay taxes.  *Id*.  This system

broke down "when Southland, because of attachments by its creditors, failed to pay the

required payroll taxes to the IRS on behalf of [Emergystat of Sulligent].  Thus,

[Emergystat of Sulligent's] large tax liability [was] for payroll taxes on employees, the

majority of which[] were the employees of [Emergystat of Sulligent] in name only and

were[,] in reality, employees of Southland and Southland entities."  *Id*.

As this evidence showed, the operations of Southland and its subsidiaries were

substantially intertwined.  *Id*. at \*3.  Lunan elaborated on the business practices of

7

Southland and its subsidiaries, testifying, in sum, that "internal loans between Southland entities [took] place on a daily basis in order to meet cash demands of each entity, with monthly reckonings." *Id*. at *3 n. 2.

Further evidence presented at a February 15, 2008, hearing in the bankruptcy case established that Emergystat of Sulligent ceased operations on December 18, 2007, at Lunan's direction. *Id*. at *6. Beginning at the precise moment of Emergystat of Sulligent's cessation, Extended Emergency Medical Services, Inc. ("EEMS"), a dormant entity at the time and now a defendant in this case, began operations in the same geographic area covered by Emergystat of Sulligent. *Id*. EEMS simply assumed Sulligent's operations and contractual obligations:

> [Emergystat of Sulligent's] employees became EEMS's employees; the ambulances previously utilized by [Sulligent] began to be used by EEMS; and EEMS operated under the same contracts under which [Sulligent] had previously provided services, billing the customers in EEMS's name rather than that of [Emergystat of Sulligent] and retaining the collected revenue. EEMS even began collecting for its own benefit the subsidy contractually promised to the debtor by Perry County, Alabama.

*Id*. This all took place without the permission or knowledge of the bankruptcy court and creditors. *Id*.

### (ii)    Maryland Case

As noted above, the ultimate parent company of defendants, Paladin Holdings, Inc., formerly known as Bad Toys Holdings, Inc., is the guarantor of defendants' obligations to plaintiff. (Doc. 64, Ex. 4; Doc. 65, ¶ 16.) Plaintiff sued Paladin in the United States District Court for the District of Maryland, alleging breach of the guaranty.

8

*See General Electric Capital Corp. v. Bad Toys Holdings, Inc.*, No. CV:06-559 (D. Md. 2007.) (Doc. 64, Ex. 9.) Lunan testified in the present action that the debt at issue in the Maryland case was and is the same obligation at issue before this court. (Doc. 64, Ex. 1, p. 21 - 22.) The Maryland court ultimately entered a final judgment in favor of GECC in the amount of $1,958,238.82. (Doc. 64, Ex. 9.)

### B.    Appointment of Receiver

At the outset of this case, plaintiff sought the appointment of a receiver to collect and administer the collateral used to secure defendants' obligation to repay plaintiff. (Docs. 3 & 19.) Defendants opposed the motion. (Doc. 20.) The court conducted an evidentiary hearing on plaintiff's Emergency Application for Appointment of Receiver, (doc. 3), on February 11, 2008, and again on March 4, 2008. (Docs. 8 & 14.) At the February 11 hearing, Lunan testified as defendants' representative. (Doc. 19, App.; Doc. 64, Ex. 1.) Based on evidence and testimony received at the hearings, the court granted plaintiff's motion on March 5, 2008, and appointed the Honorable Drayton Nabers, Jr. as Receiver. (Doc. 25.)

The Receiver has filed multiple reports updating the court on the status of the administration of the collateral, the most recent of which was submitted on August 5, 2009. (Doc. 110.) As of May 31, 2009, he has received or collected funds totaling $770,989.16 related to the defendants' accounts receivable and paid expenses related to the Receivership estate totaling $428,967.04. (Doc. 110, p. 2.) On July 17, 2008, the Receiver released $250,000 to plaintiff. (Doc. 110, p. 3.) As of August 5, 2009, the

9

Receiver held $70,182.68 on deposit in receivership bank accounts.  (Doc. 110.)  The Receiver is currently pursuing the sale of some of defendants' ambulances and collection of funds currently being held by the Mississippi Tax Commission.  (Doc. 110, pp. 5-6.) Finally, the Receiver is in continued negotiations with two separate entities regarding funds withheld that may be attributable to defendants' accounts receivable.  (Doc. 110, pp. 6-7.)

       **C.**     **Government Levies**

On July 23, 2008, the government served a Notice of Levy on the Receiver to collect all of Emergystat of Sulligent's property and rights to property.  (Doc. 62, Ex. 1.) The levy concerns employment tax liabilities for various periods from the third quarter of 2002 through the first quarter of 2006.  (Doc. 70, p. 8.)  The Receiver has stated that, to his knowledge, he is not in possession of any receivables belonging to Emergystat of Sulligent and is under no obligation to pay any sum to Emergystat of Sulligent.  (Doc. 62, p. 3.)  Accordingly, the Receiver has argued that he is under no obligation to satisfy the government's demands.  (Doc. 62, p. 3.)  The Receiver requested confirmation from the court that he was under no obligation to forward collateral, received in connection with his duties, to the government and that he had no obligation or authority to collect assets on behalf of Emergystat of Sulligent.  (Doc. 62, p. 5-7.)  The court denied those requests. (Docket entry dated August 7, 2008.)

**IV.**   **Motion for Summary Judgment and Subsequent Submissions**

Plaintiff General Electric Capital Corporation ("GECC") moved for summary

judgment on October 1, 2008.  (Doc. 63.)  In its Motion, plaintiff requested that the court

enter summary judgment in its favor: on all claims in the Complaint, on all existing and

accruing obligations owed to it by defendants on and after the date of judgment until such

have been completely satisfied, to foreclose on plaintiff's liens and security interests in the

collateral subject to the loan documents, and for costs and fees incurred in this case.  (Doc.

63, p. 3.)

     In its brief, plaintiff alleges that defendants breached their obligations under the

loan agreement and owe at least $2,345,000, plus accrued interest and costs.  (Doc. 64, p.

2-3.)  Plaintiff also seeks foreclosure of liens and security interests in collateral[4] securing

repayment of defendants' debt, primarily defendants' accounts receivable.  (Doc. 64, p. 3;

Ex. 2, p. 15-17, 82-83; Ex. 10.)

     Under the terms of the loan agreement and subsequent forbearance agreement,

defendants agreed to pay all obligations they owed to plaintiff on or before January 31,

2006—the maturity date specified in Forbearance Agreement No. 7.  (Doc. 64, Ex. 7, p. 4;

Doc. 65, ¶ 13.)  Defendants' failure to make this payment when due constituted an event

of default, entitling plaintiff to enforce and foreclose its liens and security interests in the

collateral.  (Doc. 64, Ex. 1, p. 17-18; Ex. 2, p. 40-45; Ex. 5, p. 5; Ex. 7, p. 4 & 11; Ex. 8, p.

2; Doc. 90, Ex. D, p. 1.)  Defendants also defaulted on the loan when they ceased or

---

[4] Exhibit 10 to Document 64 contains descriptions of the collateral which are either
summaries or excerpts taken from the loan documents.  (Doc. 64, Ex. 10.)  The court has
accepted this itemized list of collateral instead of examining voluminous records.  *See* Fed. R.
Evid. 1006.

suspended their business operations on January 23, 2008.  (Doc. 65, Ex. 2, p. 41; Ex. 1, p. 54 - 55.)

As of September 26, 2008, defendants owed obligations to plaintiff totaling at least $2,772,125.33, plus accrued and accruing interest, costs, and fees.  (Doc. 65, ¶ 15.)  This amount is net of $250,000 the Receiver distributed to plaintiff on July 17, 2008.  (Doc. 60; Doc. 65, ¶ 15.)

In the various loan documents, defendants waived all defenses and similar claims related to the amount and validity of the obligations owed to plaintiff.  (Doc. 64, Ex. 2, p. 51; Ex. 3, p. 10, Ex. 4, p. 7 & 8; Ex. 5, p. 5, 14-15; Ex. 7, p. 10.)  Lunan has acknowledged these terms of the agreement.  (Doc. 64, Ex. 1, p. 13-15.)

A.      Government's Intervention

The United States claims an interest in the property of the receivership by virtue of federal tax liens for employment taxes against Emergystat of Sulligent, Med Express of Mississippi, LLC ("Med Express") and Southland Health Services, Inc.  (Doc. 70, p. 2.)  According to the United States, these entities owe federal employment taxes in excess of $17,000,000.00.  (Doc. 70, p. 2.)  The taxes stem from wages paid and reported by Emergystat of Sulligent for persons who provided services for Southland Health Services, Inc. and its subsidiaries.  (Doc. 70, p. 2.)  These subsidiaries provided ambulance services for which they collected accounts receivable.  (Doc. 70, p. 2.)  But as discussed above, only one subsidiary, Emergystat of Sulligent, incurred the payroll tax debt for the employees through which the companies provided their services.  (Doc. 70, p. 2.)

12

Emergystat of Sulligent never paid those taxes, nor did Southland or any of its other subsidiaries.  (Doc. 70, p. 2.)

The primary assets of Southland's subsidiaries are accounts receivable, which the Receiver is collecting.  (Doc. 70, p. 3.)  According to the United States, these receivables are encumbered by both plaintiff's security interest and a federal tax lien.  (Doc. 70, p. 3.) Thus, the government intervened in this action to prevent a distribution of the assets without a determination of the relative extent and priority of liens upon and claims to the assets in the Receiver's possession.  (Doc. 70, p. 3.)  The United States admits it has no factual basis upon which to dispute plaintiff's request for entry of a money judgment. (Doc. 70, p. 6.)  However, the government opposes plaintiff's request that the court foreclose on plaintiff's liens on defendants' assets to the extent such foreclosure presumes plaintiff's interests are senior to other competing claims.  (Doc. 70, p. 6.)

In its Motion to Intervene, the United States expressed its concern that, due to the intermingling of funds from the various related Southland entities, defendants may own accounts receivable attributable to work performed by Emergystat of Sulligent.  (Doc. 70, p. 16-17.)  The government was also concerned that the Receiver may have collected accounts receivables of Med Express that were subject to a February 11, 2008, federal tax lien.  (Doc. 70, p. 16-17; Ex. 4.)  The United States argued that plaintiff's claims were junior to the government's claims in accounts receivable attributable to Emergystat of Sulligent either directly or indirectly through its successor, EEMS.  (Doc. 70, p. 17.)

The court granted the United States' Motion to Intervene, (doc. 77), and it filed a

Complaint and Cross-Claim on December 19, 2008.  (Doc. 85.)  The United States seeks a determination on the relative priorities of the liens and security interests against defendants.  (Doc. 85 at ¶ 1.)  The government's Complaint states that several companies headquartered in Vernon, Alabama, and purportedly leasing workers from Emergystat of Sulligent, did business as Emergystat or Emergystat, Inc.  (Doc. 85 at ¶ 5.)  According to the United States, Emergystat, Inc. failed to file employment tax returns or pay federal employment taxes.  (Doc. 85 at ¶ 6.)  The government adds that defendant EEMS is the successor in interest to Emergystat of Sulligent, which owes the federal government over $17 million in unpaid taxes.  (*Id.*)  As early as June 27, 2003, the United States filed notices of federal tax liens against the property and rights to property of Emergystat of Sulligent.  (*Id.*)

Additionally, the government assessed taxes on defendant Med Express for the second and third quarters of 2007.  (Doc. 85 at ¶ 7.)  Med Express refused to pay those taxes and a lien in favor of the United States arose against all property and rights to property of Med Express.  (Doc. 85 at ¶ 8.)  A notice of that federal tax lien was filed on February 11, 2008.  (Doc. 85 at ¶ 10.)

**B.	Government's Opposition to Plaintiff's Motion for Summary Judgment**

The United States takes no position on plaintiff's request for a money judgment on the contract.  (Doc. 72, p. 8.)  However, the government opposes plaintiff's request that this court foreclose upon its security interest in the collateral.  The government contends that issues exist as to the validity, extent, and relative priority of plaintiff's security interest

14

and the federal tax liens which must be determined prior to the entry of a judgment that would impair the interests of the United States.  (Doc. 72, p. 9.)

The United States argues that plaintiff cannot meet its burden in this case because plaintiff cannot show that it has a valid, perfected security interest which trumps a federal tax lien.  (Doc. 72, p. 10.)  To determine whether the government's interest or plaintiff's holds priority as to a particular receivable, the United States argues that a determination must be made as to when a particular receivable arose and to which tax debtor it belongs; whether plaintiff had actual notice of the filing of a notice of federal tax lien against that tax debtor; and when it made each "loan" to that tax debtor.  (Doc. 72, p. 11-12.)  The United States contends that discovery is necessary to make those determinations.  (Doc. 72, p. 12.)  The United States concludes that granting plaintiff's Motion for Summary Judgment, beyond a monetary judgment against the defendants, would be premature and should be denied.  (Doc. 72, p. 12-13.)

**C.    Plaintiff's Cross-Claim and Answer to Government's Cross-Claim**

Plaintiff generally denies the government's contention that the liens and other interests it claims were or are senior, prior, or otherwise superior to plaintiff's.  (Doc. 86, p. 2.)  Plaintiff also asserts a cross-claim against the United States for wrongful levy pursuant to I.R.C. § 7426.  (Doc. 86, p. 7.)

Plaintiff argues that its liens encumbering assets of defendants—the collateral— are senior, prior, and superior to any claims, liens, or other interests asserted by the government against such assets.  (Doc. 86, p. 7.)  Thus, plaintiff believes the government's

15

levies have wrongfully interfered with the collection of the proceeds of the collateral.

(Doc. 86, p. 8.)  Plaintiff contends that until such time as it has been compensated in full

for defendants' indebtedness, the government's levies are wrongful and plaintiff is entitled

to relief from them.  (Doc. 86, p. 8.)  Plaintiff requests injunctive relief from the levies and

recovery of wrongfully levied property and the proceeds thereof.  (Doc. 86, p. 9.)

### D.   Government's Answer to Plaintiff's Cross-Claim

The government denies that plaintiff has valid and enforceable first priority liens

and security interests in all collateral, and that the federal tax liens are junior, subsequent,

and inferior to plaintiff's security interests.  (Doc. 92, p. 4 & 5.)  The government also

denied that plaintiff's liens are effective against the United States as a third party.  (Doc.

92, p. 4.)

### E.   GECC's Reply to its Motion for Summary Judgment[5]

---

[5]  The court notes that plaintiff filed additional evidence with its Reply Brief.  (Doc.  90 and attached Exhibits.)  Exhibit A to the Scheduling Order in this case states, "The parties must file with the Clerk of the Court, simultaneously with their briefs, all evidentiary materials . . . relied upon in support of or opposition to summary judgment motions . . . ."  (Doc. 52, Ex. A, p. 6.)  Exhibit A does not allow the moving party to submit additional evidentiary materials with its Reply Brief.  The reason for this rule is obvious – the nonmoving party must be allowed at least "a reasonable and meaningful opportunity to challenge a motion for summary judgment."  *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1516 (11th Cir. 1990)(citing, *inter alia*, *Winbourne v. Eastern Air Lines, Inc.*, 632 F.2d 219 (2d Cir. 1980)("purpose of Rule 56(c) is to permit nonmoving party a meaningful opportunity to challenge motion for summary judgment")).  When faced with additional evidence submitted by the moving party after the time set for the non-moving party to file all its evidence in opposition to the motion, the court has two options: "it [can] strike the [evidence] or grant . . . the nonmoving party the opportunity to respond to it."  *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985).  Because the government had the opportunity to respond to plaintiff's additional evidence at oral argument, and no response to the Motion for Summary Judgment has been received from defendants, the court has relied upon plaintiff's additional evidence in this opinion.

Plaintiff disputes that the federal tax liens are senior to plaintiff's security interests in the collateral.  (Doc. 90, p. 2.)  Plaintiff notes that the government's priority claim is based on two different tax liens: first, a February 2008 tax lien filed against Med Express, and second, liens filed against Emergystat of Sulligent and / or Southland.  (Doc. 90, p. 2-3.)

Plaintiff argues that the United States filed its tax lien against Med Express after it had already ceased operations.  (Doc. 90, p. 3.)  At that moment, Med Express's accounts were encumbered by plaintiff's senior lien, and no new accounts have been created.  (Doc. 90, p. 3 & 8.)  Even assuming the government could claim an interest in Med Express's pre-existing accounts such an interest would be junior to plaintiff's claims.  (Doc. 90, p. 3, 7-8.)  Finally, plaintiff argues that the government may not obtain priority based on a theory that defendants are or were the alter-ego of Emergystat of Sulligent and are liable for its tax obligations.  (Doc. 90, p. 9-10.)

### F.    Joint Report filed on March 11, 2009 & Subsequent Submissions

The court heard oral argument on plaintiff's Motion for Summary Judgment on February 11, 2009.  (Doc. 105.)  Following the hearing, the government and plaintiff submitted a Joint Report to address the government's need for limited discovery to answer certain questions that arose at the hearing.  (Doc. 94.)

### (i)    Disbursement of loan proceeds

Plaintiff advanced the funds under the financing agreement to an account held by Emergystat, Inc.  (Doc. 94, p. 4; doc. 95-3, p. 2.)  Based on this information, the

17

government argues that plaintiff did not have a valid security interest under I.R.C. § 6323, and as such, the federal tax liens prime plaintiff's security interest in Med Express's accounts receivable.

### (ii)    Provision of services and generation of accounts receivable[6]

The Receiver produced detailed records to the parties that demonstrated when each account receivable arose for both Med Express and Extended Emergency Medical Services ("EEMS"). (Docs. 95-3 & 95-4.) Plaintiff contends these records show that both Med Express and EEMS rendered services prior to the recorded notice of a tax lien against them. (Doc. 94, p. 4.) However, the government argues that the records show it is entitled to some of the accounts receivable of both entities. (Doc. 94, pp. 8-9; Doc. 103, p. 5.)

### (iii)    Government's portion of the Joint Report

The government's final position is that plaintiff has not shown that it has a "security interest" or a "commercial transactions financing agreement" under federal law that would prime federal tax liens against EEMS and Med Express. (Doc. 94, p. 7; *id.* At p. 9 & n.1.) The government argues that it is entitled to all of EEMS's accounts receivable generated on or after December 18, 2007, the date upon which EEMS assumed all of the operations of Emergystat of Sulligent, Inc. (Doc. 94, pp. 9-10.) The government assessed tax liabilities against Emergystat of Sulligent as early as February 25, 2002, and Notices of

---

[6] The parties also addressed whether plaintiff received actual notice of the filing of a Notice of Federal Tax Lien against Med Express on February 11, 2008. Plaintiff did not receive notice of the government's tax lien against Med Express on or prior to February 11, 2008, or any relevant period thereafter. (Doc. 94, p. 5.) This allayed the government's concern that plaintiff had learned of the tax lien against Med Express at an earlier point.

Federal Tax Liens were filed against Sulligent as early as 2003.  (Doc. 94, pp. 9-10.)  The government claims that these federal tax liens against Emergystat of Sulligent's property and rights to property followed into EEMS, which includes accounts receivable generated after EEMS's assumption of Emergystat of Sulligent's business on December 18, 2007. (Doc. 94, p. 10.)

The United States assessed tax liabilities against Med Express on November 5, 2007, and December 31, 2007, and filed a Notice of Federal Tax Lien against Med Express on February 11, 2008.  (Doc. 94, p. 10.)  It claims that the tax lien attached to all of Med Express's property and rights to property beginning on November 5, 2007.  (Doc. 94, p. 10.)

The government believes that federal law provides for the distribution of money collected by the Receiver in the following manner:

> (1) of the $62,256.53 collected by the Receiver as of mid-February from accounts receivable of EEMS, the United States is entitled to $53,909.94, the amount collected from accounts receivable arising after December 18, 2007, and GECC is entitled to the remainder; and
>
> (2) of the $658,058.26 collected by the Receiver as of mid-February from accounts receivable of Med Express, GECC is entitled to $295,847.36, the amount collected from accounts receivable arising before November 5, 2007, and the United States is entitled to $362,210.90, the amount collected from accounts receivable arising after that date.

(Doc. 94, pp. 8-9.)[7]  The government requests that any additional collateral collected be allocated in the same manner.

_____

[7]  The parties do not dispute that plaintiff is entitled to all of the assets of Emergystat, Inc. that the Receiver has collected.  (Doc. 3, p. 9.)

Plaintiff, however,  maintains that its security interest in defendants' accounts receivable is senior to the government's.  (Docs. 96-2 & 109.)

## V.    Discussion

### A.    Money Judgment

Plaintiff requests that the court enter a money judgment against defendants for the amount owed on the loan.  Defendants have provided no opposition to plaintiff's Motion for Summary Judgment, and the government has taken no position on plaintiff's request for money judgment.  The validity and enforceability of the loan agreement between plaintiff and defendants is not in issue.  Defendants have offered no defense to plaintiff's claim for money damages.

After reviewing the evidence on record in this case, the court finds that plaintiff and defendants executed the loan transaction set forth in the loan documents.  The terms of the loan agreement are clear and unambiguous.  Defendants have been and remain in default under the terms of the loan, and their contractual indebtedness to plaintiff is fully mature, due, and currently unpaid.  Plaintiffs have affirmatively shown that there is no genuine issue of fact with respect to defendants' obligations.  At joint status conferences, conducted on September 28 and 29, 2009, plaintiff stated that, although, under the loan documents, it was entitled to accruals dating from September 26, 2008, it waived such right and agreed to final summary judgment in the amount of $2,772,125.33.  Accordingly, the undisputed facts of this case demonstrate that summary judgment is due to be granted with respect to plaintiff's claim for a monetary award in the amount of $2,772,125.33.

B.      Foreclosure of Liens & Security Interests

Plaintiff seeks foreclosure of its liens and security interests in the collateral.  The United States opposes that request, disputing the seniority of plaintiff's security interest (1) in Med Express's accounts receivable arising after November 5, 2007, and (2) in EEMS's accounts receivable incurred after December 18, 2007, the date it assumed the operations of Emergystat of Sulligent.

Following two joint status conferences, on September 28 and 29, 2009, GECC filed a Motion for Entry of Judgment on Priority, (doc. 112), and the United States responded in opposition, (doc. 113).  The motion and response were prompted by the court's expressed concern that, despite the parties' earlier requests for determination of priority interests, the matter was not procedurally postured such that the court could rule.  Plaintiff's motion outlines the procedural history of the case with respect to the priority issue, listing the various briefs and oral arguments submitted to the court.  (Doc. 112.)  The government responds that entry of judgment on the issue of priority of funds that are subject to the receivership is premature.  (Doc. 113.)  Having heard oral argument at both September 2009 status conferences, and considered the voluminous submissions of the parties, the court concludes that the matter has been fully briefed and argued, and that further discovery is not necessary or warranted.

(i)     Legal Standard

The Internal Revenue Code provides that "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of

21

the United States upon all property and rights to property, whether real or personal, belonging to such person." I.R.C. § 6321. Such a lien arises at the time the tax assessment is made and continues until the liability either is satisfied or becomes unenforceable by lapse of time. I.R.C. § 6322. A tax lien "attaches to all property and rights to property belonging to such person at any time during the period of the lien, including any property or rights to property acquired by such person after the lien arises." Treas. Reg. § 301.6321-1.

While state law governs the definition of underlying property interests, federal law dictates the priority of a federal tax lien against competing creditors. *United States v. Rodgers*, 461 U.S. 677, 683 (1983); *Rice Inv. Co. v. United States*, 625 F.2d 565, 568 (5th Cir. 1980) (citing *United States v. Pioneer Am. Ins. Co.*, 374 U.S. 84, 88 (1963));[8] *Atlantic States Constr., Inc. v. United States*, 892 F.2d 1530, 1534 (11th Cir. 1990) ("Since a federal tax lien is wholly a creature of federal law, the consequences of a lien that attaches to property interests, e.g., priority determinations, are matters of federal law."). Under federal tax law, two basic principals traditionally governed the priority of competing liens: "(i) 'the first in time is the first in right'; and a federal tax lien is superior to a nonfederal lien that is inchoate." *Atlantic States*, 892 F.2d at 1534 (quotation omitted).

However, those rules have been altered by statute. Importantly for this case, a federal tax lien is not valid against any security interest holder until the Internal Revenue

---

[8] Fifth Circuit decisions issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1210 (11th Cir. 1981).

Service has met the notice requirements of I.R.C. § 6323(a) & (f).  Further, plaintiff bears the burden of proving that it has a valid, perfected security interest that trumps the federal tax liens.  *See Rice Inv. Co.,* 625 F.2d at 571 (holder of security interest competing for priority with a federal tax lien who is able to satisfy the requirements of 26 U.S.C. 6323(c) & (h) achieves priority).

_____(ii)   **Med Express**

_____The government argues that, for two reasons, its tax lien primes plaintiff's security interest in Med Express's accounts receivable arising after assessment of tax liabilities against Med Express on November 5, 2007.  First, the government claims that plaintiff does not have a security interest that is valid under the Internal Revenue Code, and thus, plaintiff is not afforded the protections granted to holders of security interests under I.R.C. § 6323(a).  (Doc. 94, pp. 12-13.)  Second, the government contends that, without § 6323(a)'s protections, plaintiff's security interest in accounts receivable arising after the tax assessment were inchoate and thus primed by the government's liens.  (Doc. 94, pp. 11-12.)

In order for an agreement to qualify as a security interest under I.R.C. § 6323, it must satisfy four criteria:

> (1) that the security interest was acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against a loss; (2) that the property to which the security interest was to attach was in existence at the time the tax lien was filed; (3) that the security interest was, at the time of the tax lien filing, protected under state law against a judgment lien arising out of an unsecured obligation; and (4) that the holder of the security interest parted with money or money's worth.

*In re Haas*, 31 F.3d 1081, 1086 (11th Cir. 1994) (citing 26 U.S.C. § 6323(h)(1)).  Here, the government only disputes the existence of the fourth criteria.  (Doc. 94, pp. 13-15.)

Although there appears to have been little recognition of corporate formalities among Southland and its subsidiaries—including substantial commingling of accounts— the government argues that plaintiff did not part with money or money's worth because it advanced loan proceeds into an account of only one of the defendants, Emergystat, Inc., and not Med Express.  (Doc. 94, p. 14-15.)  But as plaintiff illustrates, (doc. 96-2, pp. 8-11), a secured creditor need not transfer money or money's worth directly to the debtor in order for a security interest to be valid under I.R.C. § 6323.  *See Adelvision, L.P. v. Groff*, 859 F. Supp. 797, 806 (E.D. Penn. 1994) ("Section 6323(h) and the accompanying Treasury regulation do not require that 'money or money's worth' be paid directly to the debtor or the person who has conveyed the security interest.").  And that is especially true in this case, given the substantial overlap between the related Southland entities and the fact that all three defendants were listed as "borrowers" under the loan agreement, jointly and severally liable for any debt incurred under the loan agreement.  (Doc. 64-4, pp. 1 & 14.)

The government contended at oral argument that under *United States v. 3809 Crain LP*, 884 F.2d 138 (4th Cir. 1989), and its progeny, the co-borrower relationship between the defendants is insufficient to show that loan funds advanced to one borrower constitute the parting of money or money's worth to all of them.  Instead, the government argued that

plaintiff must have advanced loan proceeds to a particular borrower, here, Med Express.

*Crain*, however, only provides that the act of parting with money or money's worth and

the granting of a security interest must be more than circumstantially related. *See id*. at

143 (4th Cir. 1989) ("Although the statute does not expressly require that the holder of the

purported security interest part with money or money's worth *in exchange for* the security

interest, we are convinced that the separate acts—the act allegedly constituting the past

consideration and the act granting the 'security interest'—must be more than

circumstantially related.").  The granting of a security interest must be done in

consideration of, that is, in a bargained exchange for, money or money's worth.  *See id*.

And such is the case here: defendants granted a security interest in the collateral in

exchange for loan proceeds that were advanced to one of their accounts, and each were

jointly and severally liable for the debt.

Nor does the court find persuasive the three additional cases cited by the

government at oral argument.  For instance, the government argues that *In re Marine*

*Energy Systems Corp.*, No. 97-01929-JW, 2009 WL 1465352 (Bankr. D.S.C. 2009),

requires a lender to show that it advanced funds to a particular debtor to prove it parted

with money or money's worth.  However, a review of *Marine Energy* merely reinforces

the Eleventh Circuit's application of the test of a security interest articulated in *In re Hass*,

which requires that a lender "part[] with money or money's worth."  *In re Hass*, 31 F.3d at

1086.  In *Marine Energy,* the court noted that neither the lender nor the borrower produced

**any** evidence of transfer of funds to the borrower sufficient to satisfy the last prong of the

25

test.  *Marine Energy*, 2009 WL 1465352 at *12 (Emphasis added).

Accordingly, the court finds that when plaintiff GECC advanced funds to a bank account held by Emergystat, Inc., it parted with money to the borrower.  Plaintiff, therefore, holds a valid security interest, for purposes of I.R.C. § 6323, covering all of defendant Med Express's accounts receivable.  Section 6323(a) gives priority to plaintiff's security interest in Med Express's accounts receivable predating the notice of filing of tax lien on February 11, 2008.[9]

_____Because I.R.C. § 6323 provides a clear resolution to the issue of priority between plaintiff and the government as to Med Express's accounts receivable, the court need not examine the government's choateness argument.[10]  *See Aetna Ins. Co. v. Texas Thermal Indus., Inc.*, 591 F.2d 1035, 1038 (5th Cir. 1979) ("[W]hatever role the 'choateness' rule of federal common law may play in other contexts, it has been supplanted by the provisions of § 6323 with respect to tax lien priority questions as to which that statute

---

[9]  Plaintiff also appears to qualify for the additional protections afforded commercial transactions financing statements, which would protect any accounts receivable created within 45 days *after* the filing of a tax lien.  *See* I.R.C. § 6323(c).  Since all of Med Express's accounts receivable arose prior to the filing of a tax lien, the court has not delved into § 6323(c).

[10]  "For a nonfederal lien to be considered choate, 'the identity of the lienor, the property subject to the lien and the amount of the lien must be established beyond any possibility of change or dispute.'" *Atlantic States*, 892 F.2d at 1534 n .9 (quoting *Rice Inv. Co. v. United States*, 625 F.2d 565, 568 (11th Cir. 1980)).  Here, the government argues that a non-federal lien against an account receivable does not arise, and is not choate, until an account receivable comes into existence, that is, when the right to payment is earned by performance.  *See* 26 C.F.R. § 301.6323(h)-1(a)(1) ("An account receivable (as defined in paragraph (c)(2)(ii) of § 301.6323(c)-1) is in existence when, and to the extent, a right to payment is earned by performance.").  (Doc. 94, pp. 11-12.)  Thus, the government argues that a federal tax lien against Med Express or EEMS primes a security interest in accounts receivable that had not yet been created through the rendering of ambulance services.  (Doc. 94, p. 12.)

provides an unambiguous federal law answer.").

      **(iii)**    **EEMS**[11]

The United States recorded a series of tax liens against Emergystat of Sulligent beginning on June 27, 2003, and continuing through June 27, 2008.  (Doc. 70, Ex. 9.)  The government contends that these tax liens remained attached to Sulligent's property and rights to property even after they had been transferred into EEMS.  (Doc. 94, pp. 9-10.)  According to the government, this would include accounts receivable created from services rendered by EEMS on or after December 18, 2007—the transfer date—but not accounts receivable that arose prior EEMS's assumption of Sulligent's operations.  (Doc. 94, p. 10.)

The government's argument is based on, essentially, two different theories.  First, the government labeled EEMS the alter ego of Sulligent at oral argument.  Second, the government argues that the federal tax lien against Sulligent attached to all of its property or rights to property, which included its future accounts receivable.  (Doc. 94, p. 10.)  Plaintiff's response at oral argument was, essentially, that the government tax lien on Emergystat of Sulligent's property and rights to property did not attach to future accounts receivable until Sulligent rendered service and gained the right to receive payment.  Thus,

---

[11]  Plaintiff has agreed to the Receiver's distribution of an account entitled "BC/BS of Alabama-Sulligent" and totaling $373.36.  (Doc. 94, p. 6.)  This account was created by services rendered between February 20, 2008, and February 28, 2008.  (Doc. 94, p. 6.)  Although the account has "Sulligent" in its title, plaintiff contends that EEMS rendered the services and that this account is subject to plaintiff's security interest.  (Doc. 94, p. 6.)  In the interest of resolving this litigation, plaintiff authorized distribution of the proceeds from the account to the IRS.  (Doc. 94, p. 6.)

once Sulligent went out of business, it could no longer create new accounts receivable, and the scope of the government's tax lien was finite—that is, Sulligent could not acquire any additional property or rights to property.

If Sulligent had continued to operate, the federal tax lien would have attached to any accounts receivable it generated.  *See United States v. McDermott*, 507 U.S. 447, 448 (1993) (Upon assessment of tax liability, "the law creates a lien in favor of the United States on all real and personal property belonging to [the taxpayer], including after-acquired property." (citation omitted)).  Because those tax liens date back to 2003, Sulligent could not claim a senior interest in the accounts receivable at issue as the holder of either a security interest, under I.R.C. § 6323(a), or a commercial transactions financing statement, I.R.C. § 6323(c), because the protection those sections afford would have lapsed long before the creation of the accounts receivable at issue, and the federal tax lien would take priority.

But, as explained above, Sulligent ceased operations and transferred all of its assets to EEMS for no consideration on December 18, 2007.  Plaintiff contends that the government has no right to accounts receivable that EEMS created after the transfer. Plaintiff cites *In re Pronto Enterprises, Inc*, 141 B.R. 179 (Bankr. W.D. Mo. 1992), for the proposition that even if the Emergystat Defendants (among them EEMS) should be combined with Sulligent under an alter ego or consolidation theory, GEEC's lien remains senior, as a matter of law, to any IRS lien subsequently attached by means of the consolidation.  Plaintiff's reliance is misplaced.  *In re Pronto* directs that where creditors,

each possessing a perfected security interest, are substantively consolidated (in a bankruptcy proceeding) the entity with the senior lien position cannot be forced to sacrifice priority by an expansion of a lien against the other entity.  *Id.* at 184.  However, in this case, the "consolidation" occurred as a result of a complete transfer of operations and obligations to a successor.  EEMS simply assumed the operations of Sulligent, using its ambulances and employees and even collecting a subsidy due Sulligent.  The transfer was done without the knowledge of Sulligent's creditors, including the United States.

This transaction, undertaken at the behest of Larry Lunan, was a sham, and it cannot be used to eliminate the debt Sulligent owed to the Internal Revenue Service.  In Alabama, a successor corporation may be held liable for the debts of its predecessor where the individual who controlled both entities ceased operation of the predecessor to avoid its debts.  *See R.E. Pilkerton Elec., Inc. v. Westinghouse Elec. Supply Co., Inc.*, 444 So. 2d 855, 855-56 (Ala. 1984) (affirming application of alter ego and instrumentality theories to disregard separateness of two corporations and hold successor corporation liable for debts of predecessor).[12]

Recognizing the transfer of assets as legitimate—even though there was no apparent business purpose for the transaction—would allow plaintiff to prime the

---

[12]  "Federal courts generally apply the law of the forum state . . . to resolve nominee, alter-ego and similar questions . . . ."  *United States v. Dornbrock*, 2008 WL 769065 at *5 (S.D. Fla. 2008); *see also Old West Annuity & Life Ins. Co. v. Apollo Group*, 2008 WL 2993958 (M.D. Fla.. 2008) (applying law of forum state for alter ego and successor liability analysis); *see also Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 728 (11th Cir. 1989) (there is essentially no difference between state and federal alter ego and nominee theories).

government's federal tax lien because of the happenstance that Lunan chose to direct the assets into a co-borrower under the loan and security agreement.  On the other hand, disregarding the transfer of assets from Sulligent to EEMS establishes the relative priorities of the government and plaintiff that would have resulted but for the sham transaction:  the government's liens take priority on post-transfer revenue.

Although plaintiff contends that EEMS was a going concern prior to the transfer, a review of EEMS's accounts receivable shows a marked increase in its operations immediately after the assumption of Sulligent's business.  The court finds that those accounts receiveable created after December 18, 2007, are properly attributable to Emergystat of Sulligent and are encumbered by the federal tax liens assessed against it.

## VI    Conclusion

For the forgoing reasons, the court is of the opinion that plaintiff's Motion for Summary Judgment (doc. 63) is due to be granted with respect to its request for entry of a money judgment against defendants Emergystat, Inc., Extended Emergency Medical Services, Inc., and Med Express of Mississippi, LLC, for all existing obligations owed to GECC under the loan documents in the amount of $2,772,125.33.

The court further concludes that final judgment on the issue of priority between respective secured claims and federal tax lien claims asserted by the plaintiff and the United States, as intervenor, is proper.  Accordingly, plaintiff's Motion for Entry of Judgment on Priority (doc. 112) is due to be granted.

With respect to plaintiff's request for foreclosure of its liens and security interests

in the collateral, the court determines the priorities and directs an accounting as follows:

1.      Plaintiff is entitled to all funds collected by the Receiver from account debtors and

        accounts of Emergystat, Inc.

2.      Plaintiff is entitled to all funds collected by the Receiver from account debtors and

        accounts of Extended Emergency Medical Services, Inc. for services with a trip

        date on or before December 17, 2007.

3.      Plaintiff is entitled to all funds collected by the Receiver from account debtors and

        accounts of Med Express of Mississippi, LLC for services with a trip date prior to

        February 11, 2008.

        An order granting GECC's motions for Summary Judgment and Entry of Judgment

on Priority will be entered contemporaneously with this Memorandum Opinion.

        **DONE** this the 30th day of September, 2009.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE